UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSE AMAYA on behalf of himself and others
similarly situated,

                    Plaintiff,

        v.

SUPERIOR TILE AND GRANITE CORP. and
SAMUEL RAMSAMMY,

                    Defendants.

**ECF CASE**

**MEMORANDUM
OPINION & ORDER**

10 Civ. 4525 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            This is an action for overtime wages under the Fair Labor Standards Act

("FLSA") and the New York Labor Law.  Defendants Superior Tile and Granite Corp.

("Superior") and Samuel Ramsammy sell granite, marble, tiles, limestone, ceramics,

glass, and accessories.  (Tr. 208-09)  Plaintiffs Jose Amaya, a tile and granite salesperson,

and Felipe Ramirez, a granite fabricator and installer, allege that they were employed by

Defendants and were not paid overtime compensation as required by the FLSA and the

Labor Law.  They seek unpaid overtime wages, liquidated damages, pre-judgment

interest, and attorneys' fees and costs.

            A bench trial was conducted on July 12 and 13, 2011.  This opinion sets

forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil

Procedure 52(a).

# FINDINGS OF FACT

## I.      THE PARTIES

1.      Defendant Samuel Ramsammy is the sole owner of Defendant Superior, a retail store in the Bronx that sells granite, marble, quartz, ceramic tiles, and similar products to the general public and contractors in the construction industry.  (Tr. 3-4, 53)  Superior is a successor to Peniel Tile.  (Tr. 33, 204)

2.      Ramsammy and Superior employed Plaintiff Jose Amaya as a salesperson, and Plaintiff Felipe Ramirez as a granite countertop fabricator and installer.  (Tr. 4-5, 90, 91-93, 140, 246)

3.      At all relevant times, the store hours of Superior were Mondays, Tuesdays, Wednesdays and Fridays 8:00 a.m. through 5:30 p.m, Thursdays 8:00 a.m. through 7:00 p.m., and Saturdays 8:00 a.m. through 3:00 p.m.  (Tr. 141-42)

## II.      PLAINTIFF JOSE AMAYA

### A.      Dates and Hours of Employment

4.      Amaya worked at Superior from January 15, 2005 through May 10, 2010. (Tr. 140, 5, 48)  Amaya was hired by Superior store manager Samuel Berko.  (Tr. 54)

5.      Amaya worked continuously for Superior and its owner, Ramsammy, without any vacations or other leave, throughout his employment.  (Tr. 140, 145) According to Ramsammy, Amaya worked a fixed weekly schedule, 8:00 a.m. to 5:30 p.m. on Mondays, Tuesdays, Wednesdays and  Fridays (9 ½ hours daily); Thursdays 8:00 a.m. to 7:00 p.m. (11 hours); and Saturdays 8:00 a.m. to 3:00 p.m. (7 hours), for a total of 56 hours per week.  (Tr. 6-7)  Ramsammy testified that Amaya took thirty minutes for lunch daily (Tr. 40), and never worked more than 53 hours per week.  (Tr. 6-8, 42-44)

6.      Amaya testified that his actual work hours were longer than the store hours.  (Tr. 141)  Amaya estimated that he worked, on average, six additional hours per week above the 56 hours that the store was open to the public.  (Tr. 141-42)  Amaya testified that there was no break for lunch.  (Tr. 142-43, 174-75)

7.      The Court finds that Amaya, on average, worked 59 hours per week.

**B.      Rate of Pay**

8.      The testimony at trial concerning Amaya's hourly rate was not clear.

9.      Amaya was paid $720.00 per week.  (Tr. 8-9, 143)  Payment was in the form of cash and checks, which varied week-to-week.  (Pltf. Trial Ex. 17, 18)  Taking Amaya's weekly pay, $720.00, and dividing that by 53 hours (the number of hours Ramsammy testified that Amaya was assigned to work each week), yields an hourly rate of approximately $13.58 per hour.

10.      Ramsammy's interrogatory responses with regard to this issue were consistent:  "Amaya was paid an hourly wage of $13.50 per hour."  (Tr. 15; Pltf. Trial Ex. 2)

11.      Amaya testified that if he left work early, his pay was reduced at a rate of $13.00 or $13.50 per hour.  (Tr. 8-9, 144, 164, 195-96)  Ramsammy did not recall what hourly rate he used to reduce Amaya's pay when he left early.  (Tr. 8-9)  When Amaya worked late, he did not receive overtime pay.  (Tr. 143)

12.      Amaya did not generally receive a payroll wage statement detailing his hours, pay, hourly rate, or any deductions.  (Tr. 49-51, 153)  Indeed, there is no evidence as to what taxes or other deductions were made from Amaya's pay on a weekly basis.  (Tr. 62)  Amaya was paid partly "on the books" and partly "off the books."

13.    The store manager, Samuel Berko, confirmed that Amaya often worked
longer than the required business hours, and was not paid overtime:

Q:    If there were customers in the store, you didn't close?

A:    No.

Q:    That was because you would like to make the sale, right?

A:    That's correct.

Q :    … Did you have a policy regarding overtime?

A:    Well, like I said, initially I told him that everybody has to make
sacrifices because at the time when Mr. Amaya came in, I wasn't
taking salary either.  I had to forego salary because we wanted to
pay back whatever money that was coming in into the business.
So I told him that we have to make sacrifices now.  When we start
getting money, all those things will be taken care of.

Q:    So when you were there, no overtime was paid, is that correct?

A:    The only overtime that was paid was on Thursdays, on Thursdays,
because it was a set time.  We closed late, so he was paying them
that extra hours after 5:00 on Thursdays.

Q:    But it was just his regular rate of pay, whatever that was, right?

A:    Yeah, mm-mm.

Q:    It wasn't time and a half, right?

A:    No, it wasn't time and a half.  No.

(Tr. 218-19)

14.    Ramsammy asserted his Fifth Amendment right against self-incrimination
when asked whether he had any method of keeping track of the hours worked by Amaya.
(Tr. 8-9, 40; Pltf. Trial Ex. 1, 2, 19 at 100-04)  Ramsammy admitted that he paid Amaya
a set weekly "salary" unless he worked fewer than 53 hours, in which case Amaya's pay
was reduced by an hourly rate that Ramsammy could not recall.  (Tr. 40-41, 44-46, 82;

Pltf. Trial Ex. 19 pp. 25-26)  When asked what reduction would be imposed when Amaya missed a day of work, Ramsammy testified, "I am not sure of the calculation."  (Tr. 82)

15.     Ramsammy testified that his store manager, Samuel Berko, established Amaya's rate of pay at $720.00 per week when he worked a full 53 hours (Tr. 48, 52, 69), and that he continued that practice throughout Amaya's employment, long after Mr. Berko's employment at Superior had ended. (Tr. 54)  Ramsammy never had any discussions with Amaya about an hourly rate of pay or weekly salary.  (Tr. 54, 70, 73)

16.     Berko confirmed that Amaya was compensated at a rate of $720 per week, not on an hourly basis.  Berko further testified that he, Ramsammy, and a representative of Automatic Data Processing, Inc. – an outside payroll firm – determined Amaya's compensation.  (Tr. 214, 243)

17.     The Court finds that Amaya was paid a flat salary of $720 per week for 53 hours of work, and that in an average week, Amaya actually worked 59 hours.

## III.   PLAINTIFF FELIPE RAMIREZ

### A.     Dates and Hours of Employment

18.     The Court finds that Ramirez worked continuously for Superior for four years between July 2006 and July 2010.  (Tr. 246, 273-76)

19.     The Court finds that Ramirez worked six days a week, and that his normal hours were 8:00 a.m. to 5:00 p.m. Monday through Friday, and 8:00 a.m. to 3:00 p.m. on Saturday, and that he often worked much longer hours.  (Tr. 247)  Ramirez estimates that he worked between 56 to 64 hours per week, although he sometimes worked even longer hours.  (Tr. 247-48)  The Court finds that, on average, Ramirez worked 60 hours per week.

### B. **Rate of Pay**

20.     Ramirez testified that he was paid $700 per week for his usual schedule, and that he received an additional $15.00 per hour when he worked more than 52 hours per week.  (Tr. 9, 86-7, 249-51, 254-55, 261, 277)

21.     For at least the first two years of his employment at Superior, Ramirez was paid only in cash.  (Tr. 250-51, 255)  Thereafter, he received both cash and checks.  (Tr. 255, 262-63)

22.     Ramirez worked more than 40 hours almost every week during the four years of his employment at Superior, and he never agreed to forego proper overtime compensation.  (Tr. 263, 269-70)

23.     Ramsammy testified inconsistently as to Ramirez's compensation.  At first, Ramsammy testified that he paid Ramirez (1) $13.00 per hour for the first 40 hours; (2) time and a half compensation (at $19.50 per hour) for hours 41 through 49; and (3) $15.00 per hour for hours worked above 49 hours.  (Tr. 19-21, 87-88)  Ramsammy's trial testimony contradicted his deposition testimony and interrogatory responses, in which he stated that Ramirez was paid a salary of $700 per week, and was paid $15.00 an hour when he worked more than 53 hours a week.  (Tr. 19-20; Pltf. Trial Ex.  1, 2, 19 pp. 21-23)  At trial, Ramsammy ultimately testified that he paid Ramirez a flat salary of $700.00 for the first 49 hours, and $15.00 per hour for all hours above 49.  (Tr. 38, 39, 98)

24.     Ramsammy asserted his Fifth Amendment right against self-incrimination when asked whether he had any method of keeping track of the hours worked by Ramirez.  (Tr. 15-16; Pltf. Trial Ex. 1-2, 19 at 100)

25.     Ramirez's pay was reduced if he worked fewer hours than his normal work schedule, but Ramsammy could not recall the calculation he used to reduce his weekly pay.  (Tr. 18; Pltf. Trial Ex. 19 at 22)

26.     Ramirez was not paid overtime compensation at a rate of one and one-half times his regular rate of pay for any hours worked above 40 in any given work week. (Tr. 98-100; Pltf. Trial Ex. 2)

27.     Ramirez was not given a weekly wage statement detailing his hours and rate of pay.  (Tr. 37-38)  He was sometimes paid by check, and sometimes paid cash. The checks did not state how many hours he had worked during the week.  (Tr. 37)

28.     The Court finds that Ramirez was paid $700 for 52 hours of work per week.  This yields an hourly rate of approximately $13.46 per hour.  The Court further finds that Ramirez received an additional $15.00 per hour when he worked more than 52 hours per week.

## IV.   SUPERIOR TILE'S ACCOUNTING PRACTICES AND SALES VOLUME

29.     Berko and Ramsammy formed Superior in early 2004 (Tr. 31-33, 203), and Berko became Superior's first general manager.  (Tr. 31, 205)  Berko is familiar with Superior's general business operations, including its leases on three buildings, its payroll practices, its other expenses, and its sales.  (Tr. 203, 207, 211, 32-33)  Berko left Superior in June 2006.  (Tr. 205)

30.     Berko testified that Superior has annual gross sales of more than $500,000.  (Tr. 222, 224-229)

31.     Superior sells granite, marble, tiles, limestone, ceramics, glass, and accessories, such as adhesives, cleaners, sponges, cutters, mosaics, caulking tubes,

wonder board, backer board, saddles, and medallions.  (Tr. 208-09)  Superior purchases these materials both locally and internationally and sells these products to the public and to professional construction contractors from its retail showroom in the Bronx.  (Tr. 209)

       32.    Berko estimated Superior's rent at approximately $160,000 per year. (Tr. 212-13)  Employees were paid in cash, and were not included on the company's "payroll."  (Tr. 213-15)  As of 2005, the company's cash payroll included 6 to 8 employees, including Berko (who was paid approximately $52,000 per year); Amaya (who was paid approximately $37,000 per year); one or more individuals in the warehouse (paid $36,000 per year); installers and fabricators (who were paid at least $37,000 per year); Ramsammy (who was paid approximately $52,000 per year); and a bookkeeper (who was paid approximately $36,000 per year).  Estimating conservatively, the company's annual payroll, although off-the-books, was $250,000.  (Tr. 215-17)  Berko also testified that Ramsammy had obtained a business loan on which payments of $30,000 per month were made.  (Tr. 227, 239)

       33.    Berko estimated that the gross sales of Superior Tile, when it was still a new business, were approximately $14,000 per week in non-contractor granite, tile, and stone sales, and an additional $25,000 to $50,000 per month in contractor sales.  Berko estimated an additional 25% in sales of accessories such as adhesives and backer boards. Using Berko's conservative estimates, during the first full year of operations (2005), Superior's sales were well over $1 million.  These figures are consistent with the testimony of Amaya and Ramirez, and the Court finds this estimate reliable.  (Tr. 147-49, 169-70)

34.     The Court finds that Superior's tax returns – which show salaries and wages of $19,229, $36,508, $42,268, and $29,443 for 2007, 2008, 2009 and 2010 respectively – entirely unreliable.[1]  These figures are utterly inconsistent with a business employing six to eight workers full time, each earning $35,000 or more annually.  Amaya alone is known to have received annual wages of approximately $37,000 from 2006 to 2009.

35.     As to income, Ramsammy denied personal knowledge of the figures reported on Superior's tax returns.  (Tr. 114, 118, 120-121, 129)  While Superior's accountant prepared the company's tax returns based upon company invoices and bank statements (Tr. 114), Berko was clear that the amounts reported to the government did not take into account "off the books" income derived from cash.  Much of Superior's business was conducted "off the books" in cash, including payment of rents and wages to employees.  (Tr. 124-125, 129, 130)

36.     It is clear that Ramsammy operated largely a cash business.  Berko testified that customers were strongly encouraged to pay in cash (Tr. 226 ("Ramsammy insisted that customers even go out from the store to bring cash to come in and pay.")), and that Ramsammy took measures to minimize the amount of income shown.  (Tr. 228)  For example, Ramsammy instructed customers to make checks payable to him or his wife to keep the money off the books of Superior.  (Tr. 229)

37.     The Court finds that Superior's tax returns and bank records are not reliable indicators of Superior's income and expenses.

38.     Ramsammy did not seek guidance from the company's accountant concerning compliance with wage and hour laws.  (Tr. 129-130)  As a business owner

---

[1]  Defendants offered no tax return showing salary and wage information for 2006.

since at least 2005, however, Ramsammy understood that "overtime" is defined as work

in excess of 40 hours in any single workweek.  (Tr. 35)

## CONCLUSIONS OF LAW

I.    **FAIR LABOR STANDARDS ACT**

The FLSA "embodies 'a uniform national policy of guaranteeing

compensation for all work or employment engaged in by employees covered by the

Act.'"  Moon v. Kwon, 248 F. Supp. 2d 201, 227 (S.D.N.Y. 2002) (quoting Tenn. Coal,

Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 602 (1944)) (citing Reich v.

New York City Transit Auth., 45 F.3d 646, 648 (2d Cir. 1995)).  To that end, the FLSA

specifies that an employer must pay employees who work in excess of forty hours during

a workweek for the excess hours "at a rate not less than one and one-half the regular rate

at which he is employed."  29 U.S.C. §207(a)(1); see also Moon, 248 F. Supp. 2d at 227

("FLSA also requires employers to pay such employees at a premium rate 'not less than

one and one-half times the regular rate at which he is employed' for any hours worked in

excess of forty per week." (quoting 29 U.S.C. § 207(a)(1)) (citing Tran v. Alphonse Hotel

Corp., 281 F.3d 23, 31 (2d Cir. 2002))).  Employers who violate this provision are liable

to the employees affected in the amount of their unpaid overtime compensation.  Such

employers are also liable for an additional equal amount in liquidated damages.  29

U.S.C. § 216(b).

"Employer" and "employee" are defined broadly under the FLSA.  29

U.S.C. § 203(d) defines an "employer" to include "any person acting directly or

indirectly in the interest of an employer in relation to an employee," while an "employee"

is defined as any individual employed by an employer.  29 U.S.C. § 203(d), (e)(1).  There is no dispute that Plaintiffs Amaya and Ramirez were employed by Defendants.

Based on the preponderance of the evidence, Defendants employed Jose Amaya from January 15, 2005 to May 12, 2010, and employed Ramirez from July 1, 2006 to July 24, 2010.

Section 211(c) of the FLSA requires that covered employers "make, keep and preserve . . . records" concerning their employees' wages, hours, and other conditions and practices of employment.  29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(1)-(12).  Section 215(a)(5) of the FLSA makes it unlawful for any employer covered under the statute to violate these record-keeping provisions.  29 U.S.C. §215(a)(5).

As to each employee, employers are required to maintain and preserve records concerning, inter alia, (1) the total daily and weekly hours worked, (2) the regular hourly rates of pay for each week in which overtime compensation is due, (3) the total daily and weekly earnings, (4) the total wages paid, and (5) the total weekly premium pay for overtime hours.  29 C.F.R. §§ 516.2, 516.5.  These requirements are not mere technicalities, but substantive obligations that are "fundamental underpinnings" of the FLSA and critical to ensuring the statute's effectiveness, for an employer's "[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations."  Wirtz v. Mississippi Publishers Corp., 364 F.2d 603, 607 (5th Cir. 1966).  As discussed below, New York law imposes similar record-keeping obligations.  See N.Y. Lab. L. §§ 195, 661; N.Y. Comp.Codes R. & Regs. tit. 12, § 138-3.1.

An employer and employee cannot agree to waive the overtime requirements of the FLSA.  See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697 (1945).  A

11

mistaken belief or misunderstanding of the law is not a valid defense to an FLSA

overtime claim.  Greenberg v. Arsenal Bldg. Corp., 144 F.2d 292 (2d Cir. 1944), rev'd on

other grounds sub nom Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697.

       Based on the evidence adduced at trial and the findings of fact set forth

above, this Court concludes that Superior and Ramsammy violated the FLSA by (1)

failing to pay overtime compensation to Amaya and Ramirez for all hours worked above

40 each workweek; and (2) failing to make, keep and preserve records with respect to

Plaintiffs' wages, hours and other conditions of their employment.

## II.    NEW YORK LABOR LAW

       New York's Labor Law is the state analogue to the FLSA.  Although the

Labor Law "does not require a plaintiff to show either a nexus with interstate commerce

or that the employer has any minimum amount of sales," it otherwise mirrors the FLSA

as to the obligation to pay overtime compensation.  Chun Jie Yin v. Kim, CV 07-1236

(DLI) (JO), 2008 U.S. Dist. LEXIS 118533, at *10; N.Y. Labor Law § 198; 12

N.Y.C.R.R. § 142-2.2 (an employer shall pay an employee for overtime at a wage rate of

one and one-half the employee's regular rate in the manner and methods provided in the

FLSA); see also Moon, 248 F. Supp. 2d at 227 ("New York law imposes similar overtime

requirements [as the FLSA], requiring employers to pay their employees 'for overtime at

wage rate of 1 1/2 time the employee's regular rate' for hours worked in excess of 40

hours for nonresidential employees, and in excess of 44 hours for residential employees."

(quoting N.Y. Comp. Codes R. & Regs. tit. 12, § 138-2.2)).

       It is the employer's responsibility to keep records of employees' wages

and hours.  See Labor Law §§ 661, 195.  "[E]very employer shall establish, maintain, and

preserve for not less than six years contemporaneous, true, and accurate payroll records

showing for each week worked the hours worked, the rate or rates of pay and basis

thereof . . . gross wages, deductions, allowances . . . and net wages for each employee."

Id. § 661.

For the same reasons discussed above in connection with Plaintiffs' FLSA

claims, the evidence adduced at trial demonstrates that Defendants have violated the

Labor Law's overtime compensation and record-keeping provisions.

## III.   **DAMAGES**

The employee's "regular rate" during a particular week is the basis for

calculating overtime pay due to the employee for that week.  The hourly rate of pay is

determined by dividing the employee's total workweek compensation by the number of

hours worked during the workweek.  The overtime rate, then, would be one and one-half

of that rate, and would be owed for each hour in excess of 40 hours worked during the

workweek.  The measure of damages is the amount the plaintiffs should have been paid

under the FLSA and Labor Law minus the amount Plaintiffs actually were paid.

### A.   **Hours Worked and Wages Paid**

An employee must be paid for all time spent in physical or mental

exertion, whether burdensome or not, pursued primarily for the benefit of the employer or

the employer's business.

Under the FLSA and Labor Law, the employer is required to furnish to its

employees a statement with every payment of wages, listing hours worked, rates paid,

gross wages, allowances, if any, claimed as part of the minimum wage, deductions and

net wages.  The word "furnish" as used here means giving the statement to the employee

to take with him.  Here, Defendants failed to furnish such statements to Plaintiffs and – as discussed below – this Court may take that failure into account by giving weight to Plaintiffs' accounts of the hours they worked and the wages they received.

The FLSA and Labor Law require only the employer, not the employee, to keep such records.  Jiao v. Chen, No. 03 Civ. 0165(DF), 2007 WL 4944767 (S.D.N.Y. Mar. 30, 2007); Tran v. Alphonse Hotel Corp., 281 F.3d 23, 31 (2d Cir. 2002).  One of the purposes of requiring that this data be kept is to ascertain compliance with the FSLA and Labor Law.

Here, Defendants kept inadequate records of employment, hours worked, and compensation paid to the Plaintiffs.  When an employer fails to keep accurate records, or keeps no records, courts permit the employee to carry his burden of proof based upon his recollection of hours worked, which is presumed to be correct.  Reich v. Southern New England Telecom Corp., 121 F.3d 58, 69 (2d Cir. 1997); Zeng Liu v. Jen Chu Fashion Corp., 00 Civ. 4221 (RJH) (AJP), 2004 U.S. Dist. LEXIS 35 (S.D.N.Y. 2004); Chao v. Vidtape, 196 F. Supp. 2d 281 (E.D.N.Y. 2002).

Under both the FLSA and the Labor Law, Plaintiffs' burden of proof as to hours and wages is satisfied by "sufficient evidence to show the amount and extent of [their] work as a matter of just and reasonable inference."  Reich, 121 F.3d at 67 (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946), superseded by statute on other grounds).  In Anderson, the Supreme Court explained the rationale behind this rule:

> [W]here the employer's records are inaccurate or inadequate . . . the solution . . . is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated

> work.  Such a result would place a premium on an
> employer's failure to keep proper records in conformity
> with his statutory duty; it would allow the employer to keep
> the benefits of an employee's labors without paying due
> compensation as contemplated by the Fair Labor Standards
> Act.

Anderson, 328 U.S. at 687.

Given Defendants' record-keeping failures, Plaintiffs have carried their burden of proof as to the hours they worked and the compensation they received.  The law does not require Plaintiffs to recall exact dates, exact hours, or exact amounts of wages received.  Here, Plaintiffs have provided a reasonable estimate of the dates and hours they worked, and the pay they received.  Such a reasonable estimate is sufficient based on their testimony alone.  Anderson, 328 U.S. at 687-88; Jiao v. Shi Ya Chen, 03 Civ. 0165 (DF), 2007 U.S. Dist. LEXIS 96480 (S.D.N.Y. 2007); Jin v. Pacific Buffet House, Inc., CV-06-579 (VVP), 2009 U.S. Dist. LEXIS 74901, *15 (E.D.N.Y. 2009); Padilla v. Manlapaz, 643 F.Supp.2d 302, 2009 U.S. Dist. LEXIS 75186 (E.D.N.Y. 2009); Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005); Cent. Pension Fund v. Murphy's Tire, Inc., 97-CV-814, 1998 U.S. Dist. LEXIS 19369 (N.D.N.Y. 1998); see also 29 U.S.C. § 211; 29 C.F.R. § 516.5(a); 516.6(a); New York Labor Law § 196-a; 12 N.Y.C.R.R. §§142-2.6(a), 142-2.7.

Once an employer is found to have paid an employee less than the law requires, the employee is entitled to recover the underpayment from the employer, regardless of whether the employee complained about or protested the underpayment.  12 N.Y.C.R.R. § 142-2.7

At trial, at his deposition, and in response to written interrogatories, Ramsammy asserted his Fifth Amendment right against self-incrimination when asked

how Superior kept track of hours worked by Plaintiffs.  Under these circumstances, this Court may assume that the testimony, if given, would have been favorable to Plaintiffs. In other words, the court may infer, based upon Ramsammy's refusal to testify, that Superior did not properly or adequately track the number of hours worked each day by Plaintiffs.  See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976).

In addition, Plaintiffs were paid partly in cash and were not provided with proper documentation, in violation of the FLSA and the Labor Law.

To calculate damages, the Court must determine the approximate number of hours worked by Plaintiffs and the wages Plaintiffs received.  The overtime rate is time and one half, or 1.5 times, the employee's regular rate of pay.

An employer is not exempt from paying overtime wages merely because it pays the employee a weekly salary.  The fact that Plaintiffs regularly worked more than 50 hours per week does not indicate that the employees' weekly salary was intended to include the overtime premium required by the FLSA and Labor Law.  There is no evidence that Plaintiffs and Defendants intended and understood that the weekly salary included overtime hours at the premium rate.  An agreement for a fixed weekly salary for more than 40 hours of work per week only complies with the FLSA and Labor Law if there is an explicit understanding between the employer and employee as to regular and overtime rates.  Giles v. City of New York, 41 F. Supp. 2d 308, 316-317 (S.D.N.Y. 1999); Wong v. Hunda Glass Corp., 09 Civ. 4402 (RLE), 2010 U.S. Dist. LEXIS 62653, *5.  There was no such agreement in this case.  Superior has not shown that Amaya or Ramirez's weekly salary included overtime payments required by the FLSA and Labor Law.  Moreover, it is improper to put an employee "on salary" and then reduce his pay on

an hourly basis when he misses a fraction of a day's work.  See Donovan v. Carls Drug, 703 F.2d 650, 652 (2d Cir. 1983) (rejected on other grounds by McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133–34 (1988).); 29 C.F.R. 541.602.

The measure of damages is the difference between what plaintiffs should have been paid under the FLSA and Labor Law and the amount that the Plaintiffs were actually paid.

### B.   Hourly Rate Calculation

The first step in determining damages is to determine what the hourly rate was for the week in question.  The hourly rate is arrived at by dividing the gross wages each plaintiff received from Defendants for a week by the hours worked by Plaintiffs. 12 N.Y.C.R.R. § 142-2.16

The evidence demonstrates that Amaya was generally paid $720.00 for a 53 hour workweek.  Accordingly, Amaya's hourly rate was approximately $13.58.

The evidence demonstrates that Ramirez was paid $700.00 for a 52 hour workweek.  As such, his hourly rate was approximately $13.46.

### C.   Overtime Rate Calculation

Plaintiffs were not paid at least 1.5 times their hourly rate for each hour of work over 40 hours.  To calculate Plaintiffs' overtime wage damages, the Court multiplies the hours worked over 40 by 1.5 times their "regular rate."  See, e.g., 12 N.Y.C.R.R. § 142-2.2.

Amaya worked on average 59 hours per week, and Ramirez worked on average 60 hours per week.

Attached as an appendix to this Opinion and Order are charts reflecting the overtime compensation due to Plaintiffs.

## IV.     LIQUIDATED DAMAGES

Under the FLSA, Plaintiffs are entitled to recover not only unpaid wages and overtime compensation, but also an equal amount in liquidated damages, as well as attorneys' fees and costs.  29 U.S.C. § 216(b) (an employer who violates the  overtime provisions of the FLSA "shall be liable to the employee or employees who are affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, . . . and in an additional equal amount as liquidated damages")[2]  Under the FLSA, liquidated damages are considered compensatory, not punitive.  Pavia v. Around the Clock Grocery, 03 CV 6465 (ERK), 2005 U.S. Dist. LEXIS 43229 (E.D.N.Y. Nov. 15, 2005).  An employer may avoid liquidated damages only if it meets the "'difficult' burden of establishing, by 'plain and substantial' evidence, its subjective good faith and objective reasonableness."  Moon, 248 F. Supp. 2d at 234.  "Double damages are the norm, single damages the exception."  Reich, 121 F.3d at 71.

Courts have discretion to deny an award of liquidated damages where the employer shows that, despite the unlawful acts, the employer acted in subjective "good faith" and had objectively "reasonable grounds" for believing that the acts or omissions giving rise to the failure did not violate the FLSA.  29 U.S.C. § 260.  "'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its

---

[2]  "As used in the FLSA 'liquidated damages' is something of a misnomer.  It is not a sum certain, determined in advance as a means of liquidating damages that may be incurred in the future.  It is an award of special or exemplary damages added to the normal damages."  Brock v. Superior Care, Inc., 840 F.2d 1054, 1063 n. 3 (2d Cir. 1988).

development.  It requires that an employer first take active steps to ascertain the dictates

of the FLSA and then moves to comply with them."  Reich, 121 F.3d at 71.

Here, Defendants have not demonstrated that they acted in good faith to

attempt to comply with the overtime wage requirements.  Indeed, Ramsammy concedes

that he did not seek guidance from the company's accountant concerning the wage and

hour laws.  (Tr. 129-130)

Under the Labor Law, an employee may be awarded liquidated damages

amounting to 25% of the total wages owed by the employer "upon a finding that the

employer's failure to pay the wage required . . . was willful."  Labor Law § 198(1-a); id.

§663(1).  An employer acts "willfully" if it "knowingly, deliberately, or voluntarily

disregards its obligation to pay wages."  Ayres v. 127 Rest. Corp., 12 F. Supp. 2d 305,

309 (S.D.N.Y. 1998).  The plaintiff need not prove that the defendants acted maliciously

or in bad faith.  Id.; see also Tlacoapa v. Carregal, 386 F. Supp. 2d 362, 368 (S.D.N.Y.

2005) ("Normally, when an employer is found liable for unpaid minimum wages or

overtime, the full award of liquidated damages provided for in the statute is mandatory.").

Under the FLSA "liquidated damages are not a penalty exacted by the law,

but rather compensation to the employee occasioned by the delay in receiving wages

caused by the employer's violation of the FLSA."  Herman v. RSR Sec. Serv. Ltd., 172

F.3d 132, 142 (2d Cir. 1999).  In contrast, liquidated damages under the Labor Law serve

an entirely different purpose.  Under the Labor Law, liquidated damages "constitute a

penalty" to deter an employer's willful withholding of wages due."  Reily v. NatWest

Markets Grp., Inc., 181 F.3d 253, 265 (2d Cir. 1999).  Given that these damages are

meant to punish the employer, they are awarded upon an affirmative showing that the employer's conduct was "willful."

Here, there is overwhelming evidence both that Defendants did not comply with federal and New York state record-keeping requirements and that they improperly failed to pay required overtime compensation to Plaintiffs.  The Court concludes that Defendants' violations of the law were willful.  Accordingly, Plaintiffs are entitled to liquidated damages under both the FLSA and the Labor Law.

Plaintiffs request an award of liquidated damages under the FLSA for the three years prior to the filing of the Complaint, because the FLSA provides for a three-year statute of limitations where a defendant's violations are willful.  Plaintiffs further request liquidated damages under the Labor Law for the entire period of their employment at Superior.  The statute of limitations for violations of the Labor Law's overtime requirements is six years.  See Labor Law § 198(3), 663(3); Wong v. Hunda Glass Corp., 2010 U.S. Dist. LEXIS 62653, *7-8.  The Complaint was filed on June 9, 2010.

Plaintiffs will be awarded liquidated damages in the amounts they seek under both the FLSA and the Labor Law.  The award under the FLSA compensates Plaintiffs for the delay in receiving their wages.  The penalty damages under the Labor Law serve as a deterrent against employers' willful violations.  Each statute provides Plaintiffs with a distinct remedy.  The appropriate amounts of liquidated damages are set forth in the appendix accompanying this Opinion and Order.

## V.    PRE-JUDGMENT INTEREST

Plaintiffs also request an award of pre-judgment interest for their state law claims. See C.P.L.R. § 5001 (McKinney 2007); Reilly v. NatWest Mkts Group, Inc., 181 F.3d 253, 265 (2d Cir. 1999) (holding that pre-judgment interest is appropriate where liquidated damages have been awarded under the Labor Law)

Courts routinely grant pre-judgment interest in connection with awards under the Labor Law pursuant to C.P.L.R. § 5001. See Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005). The interest rate is computed at 9% per annum. See C.P.L.R. §§ 5001(b), 5004. The Court's award for pre-judgment interest is reflected in the damages chart found in the appendix to this Opinion and Order.

## CONCLUSION

For the reasons stated above, Plaintiffs have proven, by a preponderance of the evidence, that Defendants Superior Tile and Ramsammy violated the FLSA and the New York Labor Law. Plaintiff Jose Amaya is awarded damages of $74,116 against both Defendants and Plaintiff Felipe Ramirez is awarded damages of $66,128 against both Defendants. Plaintiffs are directed to submit any application for attorneys' fees and costs by January 20, 2012, and to submit an appropriate form of judgment at that time. Defendants will submit any opposition by January 27, 2012.

The Clerk of the Court is directed to terminate Plaintiffs' motion in limine (Dkt. No. 29).

Dated: New York, New York
      January 17, 2012

SO ORDERED.

Paul G. Gardephe
United States District Judge

21